**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CLASS ACTION**
**CASE NO. 1:14-cv20484-BLOOM**

**SARAH ALHASSID, &**
**SARAH DRENNEN**
on their own behalf and on behalf
of all others similar situated**,**

**Plaintiff,**

**vs.**
**BANK OF AMERICA, N.A., &**
**NATIONSTAR MORTGAGE LLC**
**(D/B/A CHAMPION MORTGAGE),**

**Defendants.**

_____/

**THIRD AMENDED CLASS ACTION COMPLAINT**

COMES NOW Plaintiffs Sarah Alhassid and Sarah Drennen ("Plaintiffs"), pursuant to this Court's Order [D.E. 143] files this Third Amended Complaint, on their own behalf and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants Bank of America, N.A. ("BOA"), and Nationstar Mortgage LLC d/b/a Champion Mortgage ("Champion"), to be collectively referenced as "Defendants," and further state as follows:

**INTRODUCTION**

1.      This class action lawsuit addresses the harm done to mortgage borrowers by loan servicers [BOA & Champion] where they billed the loans they serviced various excessive and unauthorized "service fees," and when the loan servicers

1

unlawfully and under false pretenses instituted foreclosure proceedings against the borrowers.

2.      Mortgage servicers [such as BOA and Champion] buy existing home loans and then profit by collecting fees on each payment made.

3.      In this case, Defendants engaged in a scheme to increase its profits on the mortgage debts they serviced by unlawfully adding those "fees" to the mortgage loan balances.  If the borrower didn't immediately pay the bill for the "fees," the Defendants wrongfully placed the loan in "default status[1]."

4.      Once the loan was [wrongfully] placed in "default status," the Defendants would increase the balances of the mortgage loans by systematically charging excessive, fraudulent, and unauthorized fees to the loan balances, in the run-up to the [illegal] foreclosure action.

5.      Fees such as  monthly "service fees" (for nothing), "property preservation fees" (that were not authorized -according to the loan documents- and did not occur) "property inspections fees" (that were not authorized -according to the loan

---

[1] Bank of America purchased an unnecessary Forced Placed Insurance ["FPI"] policy at a hyper-inflated premium rate of $6,467.31, for Sarah Alhassid's property and then demanded immediate payment of the FPI premium under the threat of foreclosure, if the premium was not paid.  The purchase of FPI policy was the catalyst for the [Sarah Alhassid] loan going into default status. The wide-spread illegal FPI kickback scheme that Defendants engaged in was exposed by the media, dealt with in Congress and is the subject of several class action law-suits.  BOA's involvement in this fraudulent practice was exposed in several class action lawsuits, and a November 9, 2010 article in *American Banker*, *see* http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html; *see also Arnett v. Bank of America, N.A., et al.*, No. 3:11-cv-01372 (D. Or. Nov. 14, 2011).  Champion's involvement in the illegal FPI kickback fraud was dealt with in a class action in this District.  *see Braynen v. Nationstar Mortgage, LLC, et al.*, No. 1:14-cv-20726-JAL (S.D. Fla. Feb 27, 2014). The instant law-suit stems from the unauthorized and excessive fees that the loan servicers tacked on to the loans, (such property inspection fees hidden as monthly service fees), before and after wrongfully placing the loans in default status.

documents- and did not occur) "property appraisals" (that were not authorized - according to the loan documents- and did not occur),  "delinquent property taxes[2]" without any proof of delinquency or non-payment and, in fact, when the property taxes were not delinquent at all, and "attorney's fees." [3]

6.     After inflating the balances on the loans with the above-mentioned excessive unauthorized and unlawful fees, Defendants then commenced illegal foreclosure actions, under false pretenses, to strip the borrowers of their homes, with the sole intent to profit (from the inflated balances) on the backs of the borrowers when they sold the asset at auction. Elderly borrowers with reverse mortgages, like Sarah Alhassid, were targets of this general scheme by the Defendants thousands of times throughout the relevant time-period.

7.     Improprieties surrounding fraudulent property inspections reports (for inspections that never occurred) and property preservation fees (for work never performed) are well documented.  The Office of Inspector General of The Federal Housing Finance Agency issued a report detailing the [multi-million dollar] fraud associated with the property inspections on March 25, 2014. http://origin.www.fhfaoig.gov/Content/Files/AUD-2014-012.pdf

8.     In fact, individuals at the helm of property preservation companies hired by BOA (and other Loan servicers) to perform property inspections and property

---

[2] Paid by agents of Champion at the direction of Champion.  On December 5, 2013, a corporation called "Industry Consulting Group Inc.," prematurely paid Alhassid's property taxes for 2013 that were due in April 2014.
[3] The bill came with no explanation from the Defendants as to why thousands of dollars of attorney's fees were billed to the loans.

preservations have plead guilty for falsifying and submitting 12.7 Million dollars in false property inspection claims[4].

9.      The instant case came about when the Defendants wrongfully placed the [Alhassid] loan in "default status" under false pretenses[5], and systematically charged her unnecessary, unauthorized, excessive fees inflating the loan balance. These fees diminish the equity in the property to the reverse mortgage holders (Alhassid and others) and increase the cost to carry the mortgage to the borrowers (Alhassid, Drennen and others).   The "default status" is then used by the Defendants as the catalyst to accelerate the loans on the mortgages to illegally begin the foreclosure process.

10.     The Defendants *knew* that the loans should never have been placed in "default status" to begin with, and that the fees [service fees, property preservation fees, property inspection fees, property appraisal fees, attorney's fees "delinquent

---

[4] See:  http://fhfaoig.gov/Content/Files/AUD-2014-012.pdf

[5] Bank of America first improperly placed Sarah Alhassid's loan in "default status" some time in 2009 using a false pretext of alleged non-payment of" taxes or insurance."  They never explained to Sarah Alhassid what the actual reason for the "default status was, presumably because they had no legitimate reason. All the while, BOA was improperly charging the loan a $25.00 (property inspection fee in the form of)  monthly servicing fee. When Bank of America sold and transferred the servicing rights to Champion some time in 2012, Champion performed absolutely no due diligence on its own to ascertain whether the default status on the loans they were now servicing was proper.  Turning a blind eye for its own profit, Champion continued to systematically tack on the various unauthorized and excessive fees mentioned, in the run up to the illegal foreclosure action that they filed against Sarah Alhassid in January 2014.  Proving there was no legitimate reason for the foreclosure, the actual foreclosure complaint does not specify the actual reason for the foreclosure, again amorphously charging Sarah Alhassid for not paying "delinquent property taxes or Insurance." Champion ultimately dismissed the foreclosure action against Sarah Alhassid on July 29, 2014.   In so doing, acknowledged the lack of merit to its foreclosure action, but not before causing Sarah Alhassid and countless others great harm - both financial and emotional.

taxes"] they placed on the loans were improper and unauthorized under their contracts (the loan documents) with their borrowers.

11. The Defendants placed fees on Sarah Alhassid and Sarah Drennen's loan balances such as "monthly service fees" property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were not authorized), "delinquent property taxes", "attorney's fees" all in an effort to inflate the loan balance with the ultimate goal of profiting from the loans new inflated balance. Along with their unreasonable demands for payment of these fees, the Defendants threatened mortgage borrowers with a default that would lead to the borrowers losing their homes if they did not pay the bill.

12. Once the loans were in "default status", the Defendants inflated the balance (thereby depleting any equity) of the mortgages by continuing to charge the manufactured fees mentioned above and would proceed to institute wrongful foreclosure proceedings (to profit from the eventual sale of the asset) to kick the borrowers out of their homes, causing untold damage, both emotional and financial.

## JURISDICTION, VENUE & PARTIES

13. Plaintiff Sarah Alhassid resides in Aventura, Miami-Dade County, Florida, and is and was a citizen of Florida at all times material to the allegations herein.

14. Plaintiff Sarah Drennen resides in Las Vegas, Clark County, Nevada, and is and was a citizen of Nevada at all times material to the allegations herein.

15. Defendant Bank of America, N.A. is a Delaware corporation with its principal place of business in North Carolina. BOA does business and holds and services mortgage loans throughout the United States, including Florida.

16. Defendant Nationstar Mortgage LLC d/b/a Champion Mortgage is a Delaware corporation with its principal place of business in Texas. Champion does business and holds and services mortgage loans throughout the United States, and imposes the unauthorized fees alleged herein. At some time in or around 2012, Champion was apparently assigned and began servicing Plaintiff's reverse mortgage.

17. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred within the Southern District of Florida and Miami-Dade County. Defendants regularly and systematically bill the unauthorized fees alleged herein, and transact mortgage business, with homeowners in the Southern District of Florida and Miami-Dade County. 28 U.S.C. § 1391.

18. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because this controversy is between citizens of different states. Plaintiffs are citizens of Florida and Nevada, and Defendants are citizens of Delaware, North Carolina and Texas. The matter in controversy exceeds $75,000.

19. Alternatively, jurisdiction is proper the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, as there are hundreds or even thousands of borrowers harmed by Defendants' conduct in a substantially similar way. Jurisdiction is therefore also appropriate pursuant to 28 U.S.C. § 1332(d)(2).

20. Alternatively, jurisdiction is proper under 28 U.S.C. § 1331, federal question jurisdiction. 15 U.S.C. § 1692.

**FACTUAL ALLEGATIONS REGARDING MS. ALHASSID**

21.    On February 26, 2007, Plaintiff Sarah Alhassid, as a condominium unit owner over 62 years in age, entered into a Home Equity Conversion Mortgage ("reverse mortgage") with Seattle Mortgage Company, for her condominium unit at Mystic Pointe Condo in Aventura, Florida.

22.    BOA bought Seattle Mortgage Company's reverse mortgage division in 2007 for $220 million, which included a portfolio of over $4 billion of reverse mortgages. (http://realestate.aol.com/blog/2011/02/08/bank-of-america-exits-reverse-mortgage-business/)

23.    Under paragraph two of the reverse mortgage agreement, **Exhibit A**, Alhassid was responsible for paying property taxes and flood and hazard insurance for the property.  Under a "Condominium Rider" to the mortgage agreement, **Exhibit B**, also executed on February 26, 2007, Alhassid was excused from the personal obligation of paying for property insurance so long as Mystic Pointe's Owners Association maintained a blanket insurance policy: "Borrower's obligation . . . to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association." Paragraph five of the reverse mortgage agreement, **Exhibit A**, as modified by the Condominium Rider, states that "Borrower shall pay these obligations [property insurance and tax] on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments."

24. Property tax payments are public, and Alhassid never missed a payment during the relevant period.  During all times material hereto, Alhassid paid her property taxes, as required under the reverse mortgage agreement.

25. Neither BOA nor Champion ever requested evidence of payments.

26. Alhassid's property insurance coverage obligation was satisfied pursuant to her timely condominium fee payments to Mystic Pointe and the Condominium Rider. Mystic Pointe maintained requisite property insurance during the relevant period. Defendants never confirmed that it did not.

27. Under paragraph five of the mortgage agreement, "If Borrower fails to make these payments or the property charges required by Paragraph 2 [as amended by the Condominium Rider] . . . then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." **Exhibit A**.

28. Specifically, by letter dated October 6, 2009, BOA notified Alhassid, in an improperly vague fashion, that she had missed "one or more of these tax or insurance payments." **Exhibit C.** (emphasis supplied).

29. BOA and Champion casually skipped over contractual obligations, violated their obligations to carry out those terms in good faith, and improperly manufactured a breach so that it could shamelessly rob its elderly customer of her equity and eventually institute foreclosure proceedings to take her property and render her homeless.

30. On January 10, 2012, BOA sent another misleading letter to Alhassid, this time implying that the requirement to pay the (wholly unnecessary, unauthorized and excessive) insurance payment was backed by governmental authority. Specifically, the letter stated that "While the mortgage document entitles us to foreclose in this situation, FHA's [Federal Housing Administration] preference is for us to work out another solution that will allow you to repay all balances due and retain your home." This particular letter claimed that $6,196.57 was due, a glaring inconsistency as compared with prior letters, and demonstrative of BOA's failure to execute its contractual obligations in good faith. **Exhibit D.**

31. BOA charged Alhassid property inspection fees in the form of monthly service fees. **Exhibit E,** samples of statements from BOA to Alhassid and invoices from and payments to "Five Brothers," the entity that reportedly performed inspections to Alhassid's unit on BOA's behalf.

32. Sometime in 2012 or 2013, Champion claimed to have become owner of the note, and the servicer of Alhassid's reverse mortgage after BOA agreed to sell roughly $18 billion in servicing rights for reverse mortgages to Nationstar Mortgage for approximately $25 million in late 2011. See http://reversemortgagedaily.com/2011/12/12/bank-of-america-sells-18-billion-of-reverse-mortgage-servicing-to-nationstar/.

33. Rather than performing its own due diligence of the reverse mortgage documents it was suddenly servicing for BOA with their deal referenced above, Champion maintained BOA's "default status" of the loan - with intent to profit from and continue to inflate the balance of the loan to the disadvantage of the borrower.

34.    Prior to instituting foreclosure proceedings in its reverse mortgage statements, Champion vaguely notified Alhassid inconspicuously that the loan was "Called Due: Tax & Insurance" but the statements also stated in big, bold letters, conspicuously that "THIS IS NOT A BILL."

35.    Now that the loan was in "default status" according to Champion, it began systematically and consistently tacking on various unnecessary and unauthorized charges in the form of monthly "service fees[6]" (for nothing), "property preservation fees" (that were not authorized -according to the loan documents- and did not occur)   "property inspections fees" (that were not authorized - according to the loan documents- and did not occur) "property appraisals" (that were not authorized -according to the loan documents- and did not occur), "delinquent property taxes" without any proof of delinquency or non-payment and, in fact, when the property taxes were not delinquent at all, and "attorney's fees."  Examples of these unnecessary charges are attached as **Exhibit F.**

36.    Instead of performing any due diligence to determine whether the "default status' was proper, Champion sent Alhassid correspondence dated September 17, 2013, notifying her that her reverse mortgage was "technically in default due to the non payment of taxes and/or insurance." The letter also stated that Alhassid could cure the detail by repaying the "total amount of money advanced to pay taxes and/or insurance of $6,467.31." **Exhibit G.**

---

[6] Defendants never gave Sarah Alhassid any written notice -as they were obligated to do per the loan contract- prior to charging any of the fees they added to her bill.  Fees such as the property inspection fees, property preservation fees, property appraisals' delinquent taxes, and attorney's fees.   Regardless, and in breach of their written agreement, Defendants continued to illegally charge the loan those fees for work that was not performed was excessive and unnecessary.

37.    Alhassid, personally and through her condominium owners association, contacted BOA and Champion numerous times between 2009 and 2013 to clear up any misunderstanding. She was consistently reassured by agents of BOA and Champion that there was no issue.

38.    To be safe, and in response to Champion's baseless threat, on or around October 1, 2013, Mystic Pointe transmitted, by fax, proof of property insurance (consistent with the Condominium Rider, **Exhibit B**) to Champion. Champion did not relent.

39.    Champion did not respond after being provided with proof of her compliance with her obligations under the mortgage documents and still did not, and could not, articulate precisely how and why Alhassid was in default, in violation with the reverse mortgage agreement's notice requirements.

40.    Again, between February 2007 and the filing of this third Amended Complaint, Alhassid has always timely paid property taxes, and always maintained the requisite insurance consistent with the Condominium Rider, **Exhibit B**. Nevertheless, on December 5, 2013, a corporation called "Industry Consulting Group Inc.," prematurely paid Alhassid's property taxes for 2013 that were due in April 2014.

41.    Alhassid was then charged for "delinquent taxes" in its mortgage statement, even though the taxes were not due for several months and not delinquent.

42.    On January 15, 2014, Champion served Alhassid with a foreclosure lawsuit. **Exhibit H.** Among other things, the Verified Complaint wrongly alleged that Alhassid had failed to perform her obligations by "failing to pay Taxes and/or Insurance when it became due."

43.     As a result of the filing of that lawsuit, Alhassid had to hire counsel to prevent homelessness, discover the above facts, properly defend herself in that lawsuit, and prosecute this lawsuit.  During the pendency of this class action law-suit, Champion ultimately dismissed the State foreclosure action against Sarah Alhassid on July 29, 2014.   In so doing, acknowledged the lack of merit to its foreclosure action, but not before causing Sarah Alhassid monetary damages and emotional distress.

## FACTUAL ALLEGATIONS REGARDING MS. DRENNEN

44.     Plaintiff Sarah Drennen's mortgage loan and servicing rights were sold from Bank of America to Champion in June 2013.

45.     In January 2014, Ms. Drennen, who is a traditional rather than reverse mortgage borrower, modified her mortgage loan and this process was completed in April 2014.

46.     After modification, Champion suddenly notified Drennen that there was a shortage in escrow, and her monthly payments skyrocketed to a level much higher than they were pre-modification.

47.     As was the case with Ms. Alhassid, Champion also began charging Ms. Drennen several hundred of dollars per month for "property inspection" and "legal fees" that were excessive, and unauthorized.   Examples of the fees charged to Ms. Drennen are attached as **Exhibit I.**

48.     These charges were imposed even though Ms. Drennen was never informed that her loan was in "default" status. In other words, Champion charged various

illegitimate fees to preserve a property it had no interest in, as the loan was not deemed to have been in default.

49.     Drennen has contacted Champion numerous times to clarify the shortage in escrow, and to inquire as to the "property inspection" and "legal fees" that she did not authorize, which appeared unnecessary and excessive given that no one was inspecting her home or engaging in legal activity that she was responsible for. Examples of the correspondence between Drennen and Defendants are attached as **Exhibit J.**

50.     When she contacts Champion, different Champion employees give her conflicting information, solidifying that the higher monthly payment, and additional fees, are illegitimate. **Exhibit K.**

51.     Had Drennen been aware of what would have occurred after the modification, and had Champion been up front and honest with her, she would not have modified her loan.

52.     Upon information and belief, Champion's motive, based on its actions, is to strip its borrower of her home, and initiate foreclosure proceedings after wrongfully increasing Drennen's monthly payments.

53.     Drennen has been damaged in the form of unauthorized and excessive fees, and may suffer additional damages based on Champion's continuing conduct.

## CLASS ACTION ALLEGATIONS

54.     Plaintiffs bring this action against Defendants on behalf of themselves and all other persons similarly situated pursuant to Rule 23.  Plaintiffs seeks to represent the following classes:

a)  Any and all real property mortgage borrowers (including but not limited to "reverse" mortgage borrowers) whose loans were or are currently serviced by Defendants and within the applicable statutes of limitations had their loans placed in a default status, by either Champion or its the predecessor loan servicer BOA, and were charged for unauthorized and excessive "service fees," "property preservation" fees, "property inspection" fees, " property appraisal" fees " "attorneys fees," or were charged for "delinquent property taxes" by BOA or Champion (and/or their affiliates, entities or subsidiaries);

b)  Any and all real property mortgage borrowers (including but not limited to "reverse" mortgage borrowers) whose loans were or are currently serviced by BOA or Champion and within the applicable statutes of limitations were charged for unauthorized and excessive "service fees," "property preservation" fees, "property inspection" fees, " property appraisal" fees "attorneys fees," or were charged for "delinquent property taxes" by BOA or Champion (and/or their affiliates, entities or subsidiaries);

c)  All individuals belonging to category (a) or (b) who are or were parties to foreclosure lawsuits instituted by Champion (and/or their affiliates, entities or subsidiaries); and

d)  All individuals belonging to (a), (b), (c) located within Florida.

55.   Excluded from the class are Defendants, their agents and legal representatives, assigns and successors, and any entity in which Defendants have a controlling interest.

56.     Plaintiffs reserve the right to modify and/or amend the definition of the proposed class before the Court determines if class certification is appropriate.

57.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful and deceptive practices and harmed them in the same manner.

Numerosity

58.     The Class is so numerous that joinder of all members is impracticable.

59.     Thousands of Champion and BOA customers satisfy the definition of the putative classes.

60.     BOA and Champion have marketed, sold and serviced millions of mortgages and reverse mortgages within Florida and nation-wide during the past several years.

61.     The class members are ascertainable, as their identities and contact information can be identified within Defendants' business records.

62.     It would be impractical for each member to bring suit individually.

Commonality

63.     There are questions of law and fact that are common to Plaintiff and the Class Members' claims. These common questions predominate over any questions that go particularly to any individual member of the class.  The questions include, but are not limited to:

a)   Whether, and to what extent, Defendants performed due diligence before accusing borrowers of default and placing their loans in "default status";

b)   Whether Defendants have a pervasive policy and procedure of sending borrowers false and misleading correspondence falsely notifying them of a

breach of a mortgage agreement, wrongfully assuming governmental authority, and threatening default and litigation;

c) Whether the Defendants have a pervasive policy and procedure to not send written notice to their borrowers - as they were required to do per the loan agreements- prior to charging the loans "service fees," "property inspection," fees, property "preservation" fees, property "appraisal" fees, charges for "delinquent [property] taxes" and/or "attorney's fees," and whether the fees charged bore any relationship to actual services performed, and property value preservation interests;

d) Whether Defendants have a pervasive policy and procedure of paying property taxes, and charging borrowers for "delinquent taxes," when they are in fact not delinquent;

e) Whether or not Defendants have a pervasive policy and procedure of charging "service fees," "property inspection" fees, " property preservation" fees and "property appraisal" where none of the services supposedly justifying these fees actually occur or are performed;

f) Whether Defendants have a pervasive policy procedure and goal of instituting foreclosure proceedings, "delinquent taxes" fees, and whether this violates their obligation to carry out contractual obligations in good faith;

g) Whether Defendants have a pervasive policy of wrongfully charging borrowers for attorneys' fees and costs;

h) Whether the above conduct constitutes a breach of contract;

16

i)   Whether the above conduct constitutes a breach of the covenant of good faith and fair dealing;

j)   Whether the above conduct constitutes  a violation of Florida's Deceptive and Unfair Trade Practices Act;

k)   Whether the above conduct violates FDCPA; and

l)   The appropriateness and proper form of any declaratory of injunctive relief.

<u>Typicality</u>

64.   The Class Members' claims are typical of each other's claims because of the similarity, uniformity and common purpose of Defendants' conduct.

65.   The mortgage agreements that governed Plaintiffs' relationship with Defendants is the same or similar to those of the putative class members.

66.   The threatening form correspondence received by Plaintiffs, and statements made by Defendants relating to default and the imposition of fees are the same or similar to those received by the putative class members.

67.   The excessive and unauthorized fees charged to Plaintiffs by Defendants within monthly mortgage statements are the same or similar to those of the putative class members.

68.   Defendants treated Plaintiff and the putative class members similarly and consistent with its overall policies procedures and practices by charging various unauthorized fees that bore no relationship to preservation of the property.

69.   Defendants treated Plaintiffs and the putative class members similarly and consistent with its overall policies procedures and practices and have pervasive policies and goals of wrongfully obtaining property to place mortgage loans in

17

default status, and using this as a catalyst to hyper-inflate the balance of the loans by charging the manufactured property inspections fees, property preservation fees, property appraisal fees, (falsely alleged) delinquent  taxes fees, to the balance of the loan to boost their bottom line profits, and then institute wrongful foreclosure proceedings.

<u>Adequacy</u>

70.    Plaintiffs are adequate representatives of the Class and subclasses and will fairly represent the interests of the class.

71.    Plaintiffs have retained counsel experienced in complex civil litigation, with a focus on contract and insurance matters, committed to the prosecution of this case.

72.    Plaintiffs' counsel has ample financial and legal resources to meet the demands of class action litigation.

73.    There is no conflict between Plaintiffs and the unnamed Class Members, and Plaintiffs have the time, knowledge and resources to adequately represent the class.

<u>Fed. R. Civ. P. 23 & Local Rule 23.1 Allegations</u>

74.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual class members.

75.    The claims brought by Plaintiffs and the unnamed Class Members are based on Defendants' consistent and pervasive scheme to profit from its conduct in unnecessarily charging for "service fees" (for nothing), "property preservation"

fees (for nothing), "property inspections" (that do not occur and are not authorized), "property appraisals" fees (that did not occur and were not authorized) "delinquent [property] taxes" (that were never delinquent) and attorney's fees".

76.     The claims brought by Plaintiffs and the unnamed Class Members are based on Defendants' consistent and pervasive scheme to charge these fees that bear no relationship to Defendants' interests to preserve the value of mortgaged property.

77.     The claims brought by Plaintiffs and the unnamed Class Members are based on Defendant's consistent and pervasive scheme to institute wrongful foreclosure proceedings against borrowers after these unauthorized fees are wrongfully tacked on to the loan balance.

78.     Common issues predominate because liability can be determined on a class-wide basis when the Court determines the propriety or impropriety of the above conduct. Therefore, common questions predominate over individual questions.

79.     Class representation is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

a)   Multiple separate lawsuits would be wasteful in light of the sheer volume of customers that have been charged unauthorized fees, or sued in foreclosure proceedings, by Defendants.

b)   Joinder of all class members would create hardship, inconvenience and undue expense, as mortgage borrowers falling into the class definitions reside throughout the United States.

c) Individual claims by the class members are impractical because the costs to pursue individual claims, in many circumstances, may exceed the value of what any one class members has at stake.

d) There are no known individual Class Members who are interested in controlling the prosecution of separate actions.

e) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

f) This action is manageable as a class action.

80. The prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants.

81. Defendants have acted in a manner generally applicable to the Class, making injunctive or declaratory relief with respect to the Class as a whole appropriate.

**COUNT I: BREACH OF CONTRACT –
UNNECESSARY AND EXCESSIVE SERVICING FEES AND CHARGES**
(On behalf of classes (a) & (b), against Champion)

82. Plaintiffs incorporate the allegations in ¶¶ 1-81 by reference.

83. A contract existed between Plaintiffs (and the Class Members) and Defendants, which limited actions that Defendants could take to protect its interest in mortgaged property. Plaintiff Alhassid's mortgage agreement is attached as **Exhibit A.**

84. Plaintiffs (and the Class Members), entered into mortgage agreements with Champion, the terms of which (as it relates to fees, propriety of accusations of

default, and actions that could be taken by lender to protect its interests in mortgaged property) were virtually uniform and substantially similar to those outlined in **Exhibit A**.

85.    The borrower-class members' financial obligations to Champion were strictly defined, **Exhibit A.**

86.    Under paragraph six of the reverse mortgage agreement, **Exhibit A**, Champion had the right to make inspections and appraisals of the property only "in a **reasonable manner and at reasonable times** provided that Lender **shall give the borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the property**. If the Property is vacant or abandoned or the loan is in default, Lender may take **reasonable action** to protect and preserve such vacant or abandoned Property without notice to the Borrower." **Exhibit A.**

87.    Under paragraph five of the reverse mortgage agreement, "**If Borrower fails to make these payments** or the property charges required by Paragraph 2 [including property taxes] . . . then Lender may do and pay **whatever is necessary** to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." **Exhibit A.**

88.    Plaintiffs and the Class Members received statements from Champion containing various unauthorized fees and deductions which increased the balance of the loan (constituting depletions of their equity) that were not authorized by contract. Examples of these unnecessary charges are attached as **F & I.**

89.     Champion consistently tacked on various other unnecessary and unauthorized charges in the form of "service fees" (for nothing), "property preservation" (for nothing), "property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were not authorized), "attorney's fees" and even "delinquent [property] taxes" (that were never delinquent). **F & I.**

90.     With respect to some borrowers, such as those in sub-class (b), Defendants tacked on "property inspection" and other fees even though Champion had not notified the borrowers that the loans were in default. In other words, excessive and unauthorized charges were tacked on to the loan balance even though Champion has no legitimate basis to impose the charges.

91.     These charges were not "necessary" for Champion to protect the value of the property, and were not related to Lender's interest in the property.

92.     Champion did not give notice prior to these supposed appraisals and inspections, as required under paragraph six, thus demonstrating that they did not occur, or the notice provision was breached and the borrower should thus not have been charged for these fees.

93.     The excessive and unnecessary charges were facilitated by Defendant's false and fraudulent belief that Plaintiffs and the Class Members had defaulted, when in fact they had not.

94.     Champion breached its contract with Plaintiffs and the Class Members when they billed for unnecessary charges in the form of "service fees" (for nothing), "property preservation" fees (for nothing), "property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were

not authorized), a "delinquent [property] taxes" (that were never delinquent) and "attorney's fees".

95.     Champion's conduct of charging for fees had the direct effect of raising the loan balance, thereby depleting Plaintiffs and the Class Members' equity in their properties.

96.     This ploy was utilized by Champion to maximize profits on the mortgage loans when they sold the property at foreclosure.

97.     Plaintiffs and the Class Members suffered damages as a result of Defendants' breach.

<u>**COUNT II: BREACH OF CONTRACT –**</u>
<u>**UNAUTHORIZED FORECLOSURE PROCEEDINGS**</u>
(On behalf of class (c) against Champion)

98.     Plaintiff[7] incorporates the allegations in ¶¶ 1-81 by reference.

99.     A contract existed between Plaintiff Alhassid (and the Class Members) and Champion, which limited actions that Champion could take to protect its interest in mortgaged property, accuse borrowers of default, and institute foreclosure proceedings.   Plaintiff's mortgage agreement is attached as **Exhibit A**.

100.    Plaintiff (and the Class Members), entered into mortgage agreements with Champion (or its predecessor loan servicer) the terms of which (as it relates to propriety of accusations of default, actions that could be taken by lender to protect its interests in mortgaged property, and foreclosure procedures) were virtually uniform and substantially similar to those outlined in **Exhibit A.**

---

[7] Brought on behalf of Plaintiff Alhassid, not Plaintiff Drennen, at this time. As of the time of the filing of this Third Amended Complaint, Drennen has not been served with a foreclosure suit.

101.   Paragraph five of that agreement states that "If Borrower fails to make these payments or the property charges required by Paragraph 2 . . . then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." **Exhibit A.**

102.   In violation of this provision of the mortgage agreement, Champion wrongfully accused its borrowers of not paying for an unnecessary FPI policy and/or not timely paying the property taxes[8] when due.

103.   Champion breached its contracts with Plaintiff and the Class Members by failing to give proper notice of acceleration and default under paragraph nine and sixteen of the contract, **Exhibit A,** and by failing to communicate a valid reason for default.

104.   Champion breached its contracts with Plaintiff and the Class Members by instituting foreclosure proceedings that were not authorized by contract.

105.   Plaintiff and the Class Members suffered damages as a result of Champion's breach.

106.   Plaintiff and the Class Members seek damages incurred as a result of these wrongful foreclosure proceedings (many of which, as in the case of Plaintiff, involve reverse mortgage foreclosures directed at the elderly), and relief from this

---

[8] Champion never articulated an actual valid reason for the foreclosure – because none existed- and in fact used the same vague reasons in its foreclosure law-suit (that it eventually dismissed) filed against Sarah Alhassid.  Specifically, paragraph seven of its complaint states: "On April 18, 2013, SARAH ALHASSID triggered the acceleration of debt provision under paragraph 9(b)(iii) of the mortgage by failing to perform an obligation of the Borrower, under the Security instrument; to wit, **failing to Taxes and/or Insurance** when it became due."  *See* Exhibit **H**. (Emphasis Added).

Court, including but not limited to damages and injunctive relief, to halt these wrongful foreclosure proceedings.

## COUNT III: BREACH OF CONTRACT –
## UNAUTHORIZED CHARGES FOR ATTORNEYS' FEES AND COSTS
(On behalf of classes (a) and (b), against Champion)

107.  Plaintiffs incorporate the allegations in ¶¶ 1-81 by reference.

108.  A contract existed between Plaintiffs (and the Class Members) and Champion, which limited actions that Champion could take to protect its interest in mortgaged property, accuse borrowers of default, institute foreclosure proceedings. Plaintiff Alhassid's mortgage agreement is attached as **Exhibit A**.

109.  Plaintiffs (and the Class Members), entered into mortgage agreements with Champion, the terms of which (as it relates to propriety of accusations of default, actions that could be taken by lender to protect its interests in mortgaged property, and foreclosure procedures) were virtually uniform and substantially similar to those outlined in **Exhibit A.**

110.  Plaintiffs and the Class Members were subsequently served with foreclosure lawsuits, **Exhibit H,** and charged for "Payment for Attorney Fees/Costs" and/or charged for "Legal Fees," in their mortgage statements. **Exhibits F & I.**

111.  There is nothing in the contract between Plaintiffs (and the Class Members) and Champion, that authorizes the imposition of attorneys' fees and costs during the pendency of foreclosure proceedings or otherwise. Thus, Champion breached their contract with Plaintiff and the Class Members.

112.  Moreover, insofar as the foreclosure proceedings are deemed to be unauthorized, illegitimate and wrongful as delineated in Count II above, any charges arising

from unauthorized and illegitimate foreclosure proceedings such as Champion's charge attorneys' fees and costs, also constitute a breach of contract.

113.     Plaintiffs and the Class Members suffered damages as a result of Defendant's breach.

## COUNT IV: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
(On behalf of classes (a), (b) & (c), against BOA and Champion)

114.     Plaintiffs incorporate the allegations in ¶¶ 1-81 by reference.

115.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in the performance of contractual obligations and in exercising contractual rights.

116.     Plaintiffs (and the Class Members), entered into mortgage agreements with BOA[9] and Champion, the terms of which (as it relates to propriety of accusations of default, actions that could be taken by lender to protect its interests in mortgaged property, foreclosure procedures, and assignments to third parties) were virtually uniform and substantially similar to those outlined in **Exhibit A.**

117.     Under paragraph 6 of the mortgage agreement, Champion and BOA had the right to make inspections and appraisals of the property only "in a **reasonable manner and at reasonable times provided that Lender** [ BOA and Champion] **shall give the borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the property**. If the Property is vacant or abandoned or the loan is in default, Lender may take **reasonable action** to protect and preserve such vacant

---

[9] When BOA was the assigned the mortgage from Seattle Mortgage Company.

or abandoned Property without notice to the Borrower." **Exhibit A** (emphasis added).

118.     Under paragraph five of the reverse mortgage agreement, "**If Borrower fails to make these payments** or the property charges required by Paragraph 2 [including property taxes] . . . then Lender may do and pay **whatever is necessary** to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2." **Exhibit A.** (emphasis added).

119.     Plaintiffs had a reasonable expectation under the contract that Defendants [BOA and Champion] would exercise good faith provide them written notice *prior* to charging various unauthorized excessive and fraudulent fees[10] to the loan, based on paragraph 6 of the loan documents and the explicit terms therein.

120.     Plaintiffs have met all obligations[11] under the contract, **Exhibit A,** Sections 1 though 5 and, therefore, had a reasonable expectation that Defendants [BOA and Champion] would not falsely induce them to default by purposely manufacturing

---

[10] Property inspection fees, property preservation fees, property appraisal fees. BOA charged monthly property inspection fees in the form of "service fees." **Exhibits E, F & I.**

[11] Section 1. Of the agreement deals with payment of principal and interest. Alhassid was never late with a principal or interest payment. As this was a reverse mortgage, this particular instrument did not entail Sarah Alhassid to make any principal or interest payments and Defendants, therefore, could not claim that any payments were due and owing.  Section 2 deals with Payment of Property Charges, such as property taxes that Alhassid was always current on.  Section 3 deals with Fire Hazard and other Insurance obligations that Alhassid did not breach as she was not required to purchase any insurance being in a condominium where the association maintained the requisite insurances.  Section 4 dealing with occupancy was complied with as this was Alhassid's primary (and only) residence and all obligations under this section were complied with.  Section 5 dealing with charges to borrower and protection of lenders rights in the property were likewise all complied with or were non-issues.

spurious reasons to place the loan in "default status." That reasonable expectation was borne from meeting all contractual obligations under the agreement.

121.    Defendants BOA and Champion breached the covenant of good faith and fair dealing by falsely inducing plaintiff to default when they purposely manufactured spurious reasons to place the loans in "default status", so that they could [attempt to speciously argue that the default status of the loan now could] trigger the portion of Section 6 of the agreement that gives them the right to "take reasonable action to protect and preserve such vacant and abandoned property without notice to the borrower."

122.    Based on the false inducement to default with the manufactured premise of bogus default status, both Defendants failed to provide their borrowers with written notice prior to the property inspections, they consciously and deliberately failed to discharge contractual responsibilities (charging those fees and manufacturing spurious  reasons for the "default status") frustrating the agreed common purpose under the contract and disappointing the reasonable expectation (written notice prior to inspections and imposition of the fees and not falsely inducing borrowers into "default statuses" by manufacturing spurious fees) of the plaintiffs.

123.    Sometime in 2012 or 2013, Champion claimed to have become owner of the note, and the servicer of Plaintiff's reverse mortgage after BOA agreed to sell roughly $18 billion in servicing rights for reverse mortgages to Nationstar Mortgage for approximately    $25    million    in    late    2011.        See http://reversemortgagedaily.com/2011/12/12/bank-of-america-sells-18-billion-of-reverse-mortgage-servicing-to-nationstar/.

124.   Rather than performing its own due diligence of the reverse mortgage documents it was suddenly servicing for BOA with their deal referenced above, Champion maintained BOA's "default status" of the loan - with intent to profit from and inflate the balance of the loan to the disadvantage of the borrower.

125.   After the sale/assignment of the servicing rights, Champion consciously and deliberately failed to discharge contractual responsibilities (charging those fees and falsely inducing the default in continuing on its scheme of manufacturing spurious reasons for the "default status") frustrating the agreed common purpose under the contract and disappointing the reasonable expectation (written notice prior to inspections and imposition of the fees and not based on a manufactured "default status") of the plaintiffs.   Champion caused damage by then issuing reverse mortgage statements containing various unauthorized deductions. Examples of these unnecessary charges are attached as **Exhibits E, F & I.**

126.   After equity was depleted, Plaintiff Alhassid and the Class Members further suffered damages when they were served with foreclosure lawsuits, **Exhibit H,** and when Plaintiffs were charged for "Payment for Attorney Fees/Costs" in their mortgage statements. **Exhibits E, F & I.**

127.   Champion breached its duty by consistently tacking on various unnecessary and unauthorized charges in the form of "service fees" (for nothing), "property preservation" (for nothing), "property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were not authorized), "delinquent [property] taxes" (that were never delinquent), and

attorneys' fees and cost charges that are disproportionate, do not reflect services rendered, and are not authorized. **Exhibits E, F & I.**

128.    These charges were not "necessary" for Champion to protect the value of the property, and were not related to Lender's interest in the property.

129.    Indeed, had Champion performed its obligations in good faith, would have noted that these fees were unnecessary and excessive.

130.    Had Champion performed its obligations in good faith, and performed due diligence, it would have noted, for example, that Plaintiff and the Class Members had already timely paid their property taxes.

131.    Champion's actions did not comport with Plaintiff and the Class Members' reasonable contractual expectations. Plaintiff and the Class Members, many of which are elderly reverse mortgage borrowers, thought they could trust a large financial institution to treat them fairly, yet bore the brunt of the above conduct.

132.    Plaintiffs and the Class Members were harmed by Defendants' conduct of placing unauthorized and excessive fees on the account and have suffered damages, including but not limited to being charged for  excessive and unnecessary fees in their (reverse or regular) mortgage statements, falsely inducing default a status on the loan, inflating the balances, causing a depletion of equity, inducement of payment, and institution of wrongful foreclosure proceedings, and the resulting wrongful imposition of attorneys' fees and costs to the loan balance.

### COUNT V: DECEPTIVE AND UNFAIR TRADE PRACTICES
### UNDER FLA STAT. § 501.201, *et seq.*
(on behalf of class (d), against Champion)

133.   Plaintiff[12] incorporates the allegations in ¶¶ 1-81 by reference.

134.   Fla. Stat. § 501.204 provides a private cause of action for those harmed by "unconscionable acts or practices, and unfair or deceptive acts in the conduct of any trade or commerce . . .".

135.   Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") "shall be construed liberally to promote" the policies of simplifying, clarifying and modernizing the law governing consumer protection and "deceptive and unfair trade practices," and to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

136.   Plaintiff and the Class Members are "consumers" as defined in Fla. Stat. § 501.203.

137.   Champion engaged in, and continues to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

138.   Plaintiff and the Class Members seek protection under FDUTPA Statute from Defendant's unfair practices involving wrongfully accusing Plaintiff and the Class Members of default without legitimate cause to do so, and without complying with notice provisions.

---

[12] Brought on behalf of Plaintiff Alhassid, not Plaintiff Drennen.

139.    Plaintiff and the Class Members seek protection under FDUTPA Statute from Champions unfair practices involving the imposition of unauthorized fees and deductions which increased the balance of the loan (constituting depletions of their equity) that were not authorized by contract, and were disproportionate and excessive in light of Defendants' interest to preserve the value of the property. Examples of these unnecessary charges[13] are attached as **Exhibit F.**

140.    Plaintiff and the Class Members received servicing statements from Champion containing various unauthorized fees and deductions which increased the balance of the loan (constituting depletions of their equity) that were not authorized by contract: Champion consistently tacked on various unnecessary and unauthorized charges in the form of "service fees" (for nothing), "property preservation" fees (for nothing), "property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were not authorized), attorney's fees, and even "delinquent [property] taxes" (that were never delinquent). **Exhibit F.**

141.    Champion never gave notice prior to these supposed property appraisals and property inspections,  as required by contract, thus demonstrating that they did not occur, or proper notice was not given to Plaintiff.

142.    The excessive and unnecessary charges were facilitated by Champion's false and fraudulent belief that Plaintiff and the Class Members had defaulted, when in fact they had not.

143.    Champions' conduct is unfair and unconscionable in that Plaintiff and the Class Members abided by their end of the bargain, yet Champion placed the mortgage

---

[13] Examples delineated are Monthly service fees, Property preservation fees, property inspection fees, property appraisal fees, attorney's fees, [alleged] delinquent taxes.

loans in "default status" so that they could commence charging for "service fees" (for nothing), "property preservation" fees (for nothing), "property inspections" (that did not occur and were not authorized), "property appraisals" (that did not occur and were not authorized), "attorney's fees", and even "delinquent [property] taxes" (that were paid without proof of delinquency or non-payment).

144. Champions' conduct is unfair and unconscionable in that Champion sent Plaintiff and the Class Members letters that, among others things, were intentionally vague, improperly assumed governmental authority, unilaterally announced that Defendants were "authorized" to purchase unnecessary insurance and or pay taxes, or incur other fees, and were intended to harass, mislead and intimidate the borrowers in an attempt to induce payments that were not even due under the parties' contractual agreement. This correspondence was intended to mislead the ordinary consumer. Samples of these letters are attached hereto as **Exhibits C, D & G.**

145. Champion had no reasonable basis to believe that Plaintiff and the Class Members had failed to comply with the loan contract's requirements prior to charging various unauthorized fees, accusing borrowers (many of which were elderly) of default, and even instituting foreclosure proceedings.

146. Champion's conduct was unfair and unconscionable in that it never articulated precisely how, when or why Plaintiff and the Class Members breached the [reverse] mortgage agreement; instead of aiming to cure any perceived breach, their intent was to rob equity and render borrowers homeless.

147.    A reasonable consumer would not know how or why to contest unilateral and improper accusations of default and excessive and unnecessary fees, particularly coming from large, government-regulated banks and servicers.

148.    Plaintiff and the Class Members are thus entitled to all relief stated in Fla. Stat. § 501.2105 & Fla. Stat. § 501.211, including a declaratory judgment that Defendants' conduct is unfair and deceptive, within the meaning of the Statute, and an injunction preventing further similar practices targeting regular borrowers and elderly who enter into reverse mortgage agreements.

**COUNT VI: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692, _et seq._**

(On behalf of classes (a) and (b) against Champion)

149.    Plaintiffs incorporate the allegations in ¶¶ 1-81 by reference.

150.    Congress has found that there "is abundant evidence of the use of abusive, deceptive and unfair debt collection practices by many debt collectors."

151.    A "consumer" means any natural person obligated or "allegedly" obligated to pay and debt.

152.    A "debt" means any "obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."

153.    Champion is considered a "debt collector[s]" within the meaning of the Act.

154.    Champion engaged in "false or misleading representations" in connection with their claim that Plaintiff and the Class Members owed money in connection with "force placed insurance and or taxes."

155.    Champion also engaged in "unfair practices," 15 U.S.C. § 1692f, by claiming a debt was due, when not permitted by the agreement creating the debt or federal law, **Exhibit A, reverse mortgage agreement; Exhibit B, Condominium Rider.**

156.    Specifically, Defendants purchased force-placed insurance and needlessly paid property taxes prior to the taxes being due, and informed their customers that these payments were [now] due and that there loans were in default, even though the purchase of this insurance was excessive and not "necessary" and the payment of the property taxes was premature and not needed for preservation of property values.

157.    Champion never sufficiently articulated how, when or why the Plaintiff and Class Members had breached their reverse mortgage agreements.

158.    Champion had no reasonable basis to believe that Plaintiff and the Class Members had failed to comply with a loan contract's requirements prior accusing their customers of default.

159.    Champion sent Plaintiff and the Class Members letters that, among others things, were intentionally vague, improperly assumed governmental authority, unilaterally announced that Defendants were "authorized" to purchase unnecessary insurance or incur other fees, and were intended to harass, mislead and intimidate the elderly, in an attempt to induce payments that were not even

due under the parties' contractual agreement. Samples of these letters are attached hereto as **Exhibits C, D, G & J.**

160.   Champion casually skipped over contractual obligations, violated its obligations to carry out those terms in good faith, and improperly manufactured a spurious breach so that it could shamelessly rob [in this case Plaintiff Sarah Alhassid] its borrowers of their equity and eventually institute foreclosure proceedings [against Sarah Alhassid] to take property and render them homeless.

161.   Defendant Champion also engaged in "false or misleading representations," 15 U.S.C. § 1692e in connection unnecessarily charging for "service fees" (for nothing), "property preservation" fees (for nothing), "property inspections" (that do not occur and are not authorized), "property appraisals" (that did not occur and were not authorized), "attorney's fees" and even "delinquent [property] taxes" (that were never delinquent).

162.   Plaintiff and the Class Members suffered damages as a result of Champions' violation of the FDCPA.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff requests jury trial of all claims that can be so tried.

WHEREFORE, Plaintiffs Sarah Alhassid and Sarah Drennen, on their own behalf and on behalf of the Class, pray for the following relief:

a)   Certification of this case as a Class Action on behalf of the Classes defined above and appointment of Sarah Alhassid and Sarah Drennen as Class Representatives and the undersigned as lead counsel;

b)   Declare that Defendants breached contracts by the above-described conduct;

c) Declare the Defendants violated the covenant of good faith and fair dealing by the above-described conduct;

d) Declare that Defendants violated Florida's Unfair and Deceptive Trade Practices Statute in light of the above-described conduct;

e) Declare that Defendants violated the FDCPA in light of the above-described conduct;

f) Enter Judgment against Defendants for all economic, monetary, actual, consequential, compensatory and punitive damages on behalf of the class, based on Defendants' conduct;

g) Award Plaintiff and the Class reasonable costs and attorneys' fees;

h) Award Plaintiff and the Class pre- and post-judgment interest;

i) Enter an injunction requiring a corrective measure to be taken to prevent Defendants from engaging in the above-described conduct, including a stay to wrongful foreclosure proceedings; and

j) All other relief, in law and equity, deemed appropriate by this Court.

Respectfully submitted,

**HERSSEIN LAW GROUP**
**12000 Biscayne Boulevard**
**Suite 402**
**North Miami, Florida 33181**
**Telephone No: (305) 531-1431**
**Facsimile No: (305) 531-1433**

**REUVEN HERSSEIN, ESQUIRE**
**FBN 0461504**
**IRIS HERSSEIN, ESQUIRE**
**FBN 0462391**

37

**JEFFREY L. GOODMAN, ESQUIRE**
**FBN 0068878**
**GEOFF HIRSHBERG, ESQUIRE**
**FBN 0092772**
**MAX M. NELSON, ESQUIRE**
**FBN 0084532**
**Attorneys for Plaintiff**

**Beighley, Myrick & Udell, P.A.**
**150 West Flagler Street**
**Suite 2050**
**Miami, FL 33130**
**(305)-349-3930 – Phone**
**(305) 349-3931 – Fax**

**/s/ Maury L. Udell**

**MAURY L. UDELL, ESQUIRE**
**FBN 121673**
**Attorney for Plaintiff**

38

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 1st day of December, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record identified below in the manner specified, either via transmission of the Notice of Electronic Filing generated by CM/ECF or via U.S. Mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Max M. Nelson, Esq.

Max M. Nelson, Esq.

Alan Graham Greer

agreer@richmangreer.com,

Brendan I Herbert

brendan.herbert@akerman.com,

Christopher Stephen Carver

christopher.carver@akerman.com

David L. Permut

dpermut@goodwinprocter.com

David S. Kantrowitz

dkantrowitz@goodwinprocter.com

Franklin G. Burt

fburt@cfjblaw.com

Geoff Hirshberg

geoff@hersseinlaw.com

Iris Joy Herssein

iris@hersseinlaw.com

Jeffrey Louis Goodman

jeffrey@hersseinlaw.com

Matthew G. Lindenbaum

mlindenbaum@goodwinprocter.com

Maury Lorne Udell

mudell@bmulaw.com

Maxwell Miller Nelson

max@hersseinlaw.com

Nathaniel Mark Edenfield

nedenfield@richmangreer.com

Reuven T. Herssein

reuven@hersseinlaw.com

John B. Sullivan

jbs@severson.com

Jonah S. Van Zandt

jvz@severson.com

Mark Douglas Lonergan

mdl@severson.com

Erik Kemp

ek@severson.com